

**Dated: May 30, 2018**

**The following is ORDERED:**



Janice D. Loyd
U.S. Bankruptcy Judge

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

IN RE:                                      )
                                            )
MICHAEL LEON SMITH and                      )        Case No.17-13529-JDL
ADRIANA DORALIZ SMITH                       )        Chapter 7
                                            )
                Debtors.                    )

**MEMORANDUM OPINION AND ORDER DISMISSING CASE**

### I. Introduction

Before the Court is the *Motion of the United States Trustee to Dismiss Case Pursuant to 11 U.S.C. § 707(b)(1) Based on the Totality of Circumstances Under 11 U.S.C. § 707(b)(3)* filed on November 29, 2017 (the "Motion") [Doc. 24] and *Debtors' Response to Motion of the United States Trustee to Dismiss Case Pursuant to 11 U.S.C. § 707(b)(1) Based on the Totality of Circumstances Under 11 U.S.C. § 707(b)(3)* filed on January 5, 2018 (the "Response") [Doc. 32].  The Motion of the United States Trustee ("UST") is premised on the assertion that the "totality of the circumstances" demonstrates abuse of the provisions of the Bankruptcy Code.  The Court held the evidentiary trial on the issue

of abuse on May 15, 2018. After carefully considering the evidence and arguments, the Court concludes that the Chapter 7 case must be dismissed under § 707(b)(3)[1]. In accordance with Fed.R.Bankr.P. 7052 and 9014, the Court sets forth the following findings of fact and conclusions of law in support of its decision.

## II. Jurisdiction

The Court has jurisdiction over this contested matter pursuant to 28 U.S.C. § 1334(b). Reference to the Court of this contested matter is proper pursuant to 28 U.S.C. § 157(a). This is a core proceeding as contemplated by 28 U.S.C. § 157(b)(2)(A).

## III. The Evidence

Debtors filed for bankruptcy relief under Chapter 7 on August 31, 2017.[2] Both Debtors are fifty-one years old. Debtor Michael Smith is employed in information technology, cyber security and call routing (which is the delivery of voice and technology applications to the desktop). He is presently employed at Tinker Air Force Base. Co-Debtor Adriana Smith is employed as a nurse at the Oklahoma Allergy and Asthma Clinic. Debtor Michael Smith testified that the cause of the bankruptcy was him being terminated from his employment with Energy Future Holdings on November 1, 2016. At that time his base salary was $126,800 per year plus a bonus compensation which ranged from $35,000-$100,000. His W-2 for 2016 reflected an income of $180,076.72 (but not quite for the entire year). [Debtors' Ex. 2E]. After having been unemployed for approximately

---

[1] Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq.

[2] This is the third bankruptcy case for the Debtors, having filed two previous chapter 7 proceedings in the Western District of Oklahoma, being Case No.'s 98-17968 & 05-22697.

eight months, he was employed by Frontier Communications in Texas at a salary of approximately $106,000 per year. He was then hired at Tinker Air Force Base.

At the time Debtors filed bankruptcy in August 2017 their original Schedule I reflected a total current gross monthly income of $12,225.58, with a take-home monthly pay of $9,398.88 [Doc. 1, Schedule I, pg. 31], living expenses of $9,329, resulting in a monthly disposable income of $69.88. [Doc. 1, Schedule J, pg. 33]. The UST analyst, John McLernon, testified that he computed the Debtors' gross income at $11,076.56, the allowable expenses under IRS and National standards of $7,169.00, resulting in a monthly disposable income of $1,319.62. This analysis would result in a sixty (60) month disposable income of $79,177.20 which, with total unsecured debt of $82,756, would result in a potential payout to unsecured creditors of 95.68%. [UST Ex. 5].

On May 8, 2018, the Debtors filed their Amended Schedules I and J which indicated a gross monthly income of $11,056.91, take-home income of $7,520.52, expenses of $8,387.22, with a resulting monthly disposable income of a negative $866.70. [Doc. 45]. The analysis by the UST of the amended schedules found a gross income of $10,836.95, a take-home pay of $7,609.51, allowable expenses of $6,751.44, with a resulting monthly disposable income of $858.07. This would result in a sixty (60) month disposable income of $51,484.20, making a potential payout to unsecured creditors of 62.21%.[3] [UST Ex. 13].

---

[3] The Debtors' formulated two "mock" (the Debtors' term) Chapter 13 Plans. One was a 0% return to unsecured creditors which would have required sixty (60) monthly payments to the trustee of $5,310.64. [Debtors' Ex. 6A], and the other plan a 100% dividend for unsecured creditors with a monthly payment to the trustee of $7,075.88. [Debtors' Ex. 6B]. Both plans are fundamentally flawed, if not improperly manipulated. Most significantly, rather than paying the secured debt over sixty months, the Debtors have proposed monthly payments on an accelerated basis under which the secured debt is paid under the proposed "100% plan" amortized over thirty-four (34) months and the "0% plan" in fifty-three (53) months. For example, in the 100% plan the monthly payments

The principal difference between the Debtors' and the UST's calculation of expenses was the UST reducing the Debtors': (1) transportation expenses from $1,100 to $430 because the Debtor was no longer working in Texas costing him substantial mileage and gas expense as had been the case pre-petition; (2) reducing by $771.86 the Debtor's voluntary contributions to his Federal Thrift Savings Plan (but allowing the mandatory 4.4% contribution to the Federal Employment Retirement System of $339.62); (3) disallowing the $433 monthly payment on the Debtors' 2017 Keystone travel trailer purchased in April 2017 with an outstanding balance of $50,122 since the same was no longer necessary as living accommodations as had been the case when the Debtor was working in Texas; (4) reducing the allowable monthly payments for vehicle expense by $493.12 from $1,618.56 to $1,125.44 (primarily by capping at $970 per IRS standard vehicle ownership expense for two vehicles); and  (5) disallowing the Debtors' $193.13 car payment on one of their son's vehicle. [UST Ex.13].    Debtor Michael Smith testified that he agreed the transportation expenses which he had scheduled at $1,100 was probably no longer appropriate given his change of jobs.  The UST also challenged the Debtor on the financial wisdom of his $792 per month payment on his 2017 Ford 1 ton pickup purchased in December 2016 with a balance of $57,983.  Debtor testified that he couldn't get a decent truck with a cheaper payment.

The Debtors' Schedules indicated a residence valued at $375,000, a mortgage balance of $369,956 with a monthly mortgage payment of $2,240. [Doc.1].  Debtor testified

---

on the Keystone travel trailer have increased from the average normal payment of $493 to $1,481 and on the 2017 Ford 1 ton pickup from $792 to $1,713.  These increased, accelerated monthly payments to the secured creditors assure that the plans are not feasible.

that there was an arrearage on the monthly payments of approximately $16,000; however, Debtor testified that he paid all mortgage payments through his bank checking account, and that account shows that the last mortgage payment was made on April 4, 2017. [UST Ex. 8, pg. 6]. Thus, the mortgage arrearage is likely to be at least $26,880.

What became the focal point of the trial, both financially and emotionally, was the issue of the Debtor's gambling. On cross-examination the Debtor wouldn't state whether he considered himself a "professional gambler". He did testify, however, that he considered himself in the "upper echelon" of gamblers, and that he "absolutely consider myself in gambling as a business." The Debtors' Means Test reflects monthly gross business receipts of $4,850.67. [UST Ex.3, pg. 46, line 5]. The Debtor testified that this is from gambling. The Means Test further reflects that in the six months preceding the filing of bankruptcy Debtors' average monthly income from gambling was $4,850.67 and the average monthly expense for gambling was $11,718.82, resulting in an average monthly net income of a minus $6,868.15. [UST Ex. 3, pg. 58, line 5].

The Debtors' 2015 Federal Income Tax Return reflected gambling winnings of $264,329 and gambling losses of $263,975. [UST Ex. 12]. As of the date of trial, the Debtor testified that he had prepared and filed their 2016 and 2017 Federal Income Tax Returns, but copies of the returns had not been provided to the UST and were not offered as evidence at trial. However, the Debtors' Statement of Financial Affairs reflected 2016-2017 gambling losses of approximately $150,000, winnings for 2016 as "unknown", and winnings from January 1 until the filing of bankruptcy in August 2017 of $93,719 [Doc. 1, p.39, ¶15 & p.36 ¶5]. The UST's analysis of the Debtors' bank account indicated gambling expenditures of $57,257.30 for the period of April 2017 through January 2018 [UST Ex. 7)

5

and $35,138.63 for February through April 2018. [UST Ex. 14].[4]  This is the same time period in which the Debtors have incurred a sizable arrearage claim on their home mortgage.

### IV. Dismissal for Abuse Under § 707(b)

Section 707(b) was added to the Bankruptcy Code in 1984 as part of the Bankruptcy Amendments and Federal Judgeship Act and was amended extensively in 2005 under the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA").  Post-BAPCPA, § 707(b) now provides that a Chapter 7 case may be dismissed, or converted to a Chapter 11 or 13 with consent of a debtor, to prevent abuse of the Chapter 7 provisions. Specifically, § 707(b)(1) provides, in part, as follows:

> . . . the court, on its own motion or on a motion by the United States trustee, . . . may dismiss a case filed by an individual debtor under this chapter [Chapter 7] whose debts are primarily consumer debts, or, with the debtor's consent, convert such a case to a case under chapter 11 or 13 of this title, *if it finds that the granting of relief would be an abuse of the provisions of this chapter* [Chapter 7]. (Emphasis added).

Sections 707(b)(2) and (b)(3) provide two alternatives pursuant to which a court can find relief under Chapter 7 to be abusive.  First, under § 707(b)(2), the Court can determine whether the presumption of abuse arises pursuant to the Means Test calculation of disposable income.  The UST has not raised any objection on the basis that the Debtors' Means Test raises a presumption of abuse.  Second, if the presumption does not arise or

---

[4] Additionally, the UST's analysis of the bank accounts of his two sons upon which Debtor was an authorized user revealed additional expenses which appeared to be for gambling. Giving the Debtors the benefit of the doubt as to whether the sons or the Debtors did the gambling, the Court is not taking into account the withdrawals and deposits to the sons' accounts in rendering its decision concerning the gambling issue.  The sons' bank statements did indicate both sons were employed and had the ability to afford their own car payment.

the presumption has been rebutted by the debtor establishing "special circumstances", the Court can evaluate whether abuse exists under the "totality of circumstances" test pursuant to § 707(b)(3). In short, courts construing § 707(b)(3) have uniformly held that satisfaction of § 707(b)(2), either because the presumption of abuse does not arise, or because the debtors have rebutted the presumption, does not preclude the trustee from seeking to dismiss a debtor's bankruptcy case for abuse under § 707(b)(3). See, e.g., *In re Zaporski*, 366 B.R. 758, 770 (Bankr. E.D. Mich. 2007) (finding that § 707(b)(2)(A) "offers no safe harbor to those debtors with respect to whom the statutory presumption does not arise" so that § 707(b)(2) is not a defense to a § 707(b)(3) motion to dismiss."). The moving party bears the burden of proof to support a § 707(b) motion by a preponderance of the evidence, *In re Palmer,* 542 B.R. 289 (Bankr. D. Colo. 2015), but unlike its pre-BAPCPA predecessor, § 707(b)(3) does not require a showing of "substantial abuse," but a lower standard of "abuse." See *In re Mestemaker*, 359 B.R. 849, 856 (Bankr. N.D. Ohio 2007) (emphasizing that "Congress has clearly lowered the standard for dismissal in changing the test from 'substantial abuse' to 'abuse.'").[5]

## V. Totality of Circumstances Under § 707(b)(3)

The UST's Motion is solely premised upon § 707(b)(3). Section 707(b)(3) provides that when the presumption of abuse *does not arise* under § 707(b)(2)(A),(emphasis added), or in cases when the presumption is rebutted by a debtor under § 707(b)(2)(B), a

---

[5] Not only did Congress lower the standard of proof from "substantial abuse" to "abuse", the change in BAPCPA indicates "more telling legislative evidence of a Congressional intent that bankruptcy courts should now afford less deference to a debtor's choice of Chapter 7 relief is the elimination from amended § 707(b) of the language in former § 707(b) stating that '[t]here shall be a presumption in favor of granting the relief requested by the debtor.'" *In re Tucker*, 389 B.R. 535, 538 n. 2 (Bankr. N.D. Ohio 2008); *In re Carney,* 2007 WL 4287855, at *2 (Bankr. N.D. Ohio 2007).

court's inquiry for dismissal under § 707(b)(1) must continue under § 707(b)(3) where the bankruptcy court has the discretion to make a finding of abuse based on the specific facts of the case. Specifically, § 707(b)(3) provides, in part, that when a presumption of abuse does not arise under the Means Test or is rebutted by a debtor, a bankruptcy court "shall consider – (A) whether the debtor filed the petition in bad faith; or (B) *the totality of the circumstances* . . . of the debtor's financial situation demonstrates abuse". (Emphasis added). Unlike the mechanical formula provided by the Means Test, § 707(b)(3) allows the court to make a broad, flexible review encompassing any factors that are relevant to the debtor's financial condition, including post-petition events that affect a debtor's finances. *In re Jensen*, 407 B.R. 378, 384 (Bankr. C.D. Cal. 2009); *In re Parada*, 391 B.R. 492, 500-01 (Bankr. S.D. Fla. 2008); *In re Riley*, 2010 WL 3718017 (Bankr. D. Mass. 2010).

The Bankruptcy Code does not define when the "totality of the circumstances" requires dismissal. Prior to the enactment of BAPCPA, the Tenth Circuit used a totality of the circumstances test to interpret the term "substantial abuse". *In re Stewart*, 175 F.3d 796 (10th Cir. 1999) (setting forth what are commonly referred to as the "*Stewart Factors*" in considering whether the totality of the circumstances demonstrate substantial abuse). Today, courts generally agree that because Congress added the phrase "totality of the circumstances" to BAPCPA, the pre-BAPCPA cases employing the *Stewart Factors* are applicable to the analysis of "abuse" under § 707(b)(3). *In re Witcher*, 702 F.3d 619 (11th Cir. 2012); *In re Jaramillo*, 526 B.R. 404, 411 (Bankr. D. N.M. 2015); *In re Robinson*, 560 B.R. 352, 357 (Bankr. D. Colo. 2016); *In re Mondragon*, 2007 WL 2461616 *1 (Bankr. D. N.M. 2007); *In re Wake*, 2007 WL 2670113 *2 (Bankr. E.D. Okla. 2007); *In re Crink*, 402

8

B.R. 159, 169 (Bankr. M.D. N.C. 2009) ("Pre-BAPCPA precedent provides assistance in giving meaning to the phrase 'totality of the circumstances.'").

A debtor's ability to pay is the primary factor in determining whether granting Chapter 7 relief would amount to an abuse under the "totality of the circumstances" test. S*tewart*, 175 F.3d at 809. "Ability to pay, standing alone, is sufficient to warrant dismissal of a Chapter 7 case for abuse pursuant to 11 U.S.C. § 707(b)(3) ." *Mondragon*, 2007 WL 2461616 at *1. Other *Stewart Factors* include:

1. Whether the debtor enjoys a stable source of future income;

2. Whether the debtor is eligible for adjustment of debt through Chapter 13;

3. Whether state remedies exist to ease the financial predicament;

4. The degree of relief obtainable through private negotiation;

5. Sudden illness, calamity, disability or unemployment;

6. Whether the debtor's expenses are excessive and/or can be significantly reduced without being deprived of adequate food, and clothing, shelter and other necessities;

7. The accuracy of the statements and schedules;

8. The existence of excessive cash advances or consumer purchases; and

9. The debtor's good faith.

*Stewart,* at 809-10. *Stewart* also noted that, "[W]here an inability to pay exists, we believe other factors may nevertheless establish substantial abuse. We recognize the factors

articulated by the other courts as instructive, but conclude they are not inclusive of all factors considered.  A substantial-abuse analysis must be made on a case-by-case basis." *Id.*

## VI. Analysis

The UST asserts that the totality of the circumstances supports dismissal. Specifically, the UST argues that: (1) Debtors' history, both pre-and post-petition, of gambling; (2) their use of inflated expenses in their schedules, particularly with regard to post-petition transportation expenses; (3) their wish to retain the Keystone trailer when no longer needed; (4) their ability to pay a meaningful dividend to unsecured creditors if placed in a Chapter 13, establishes a "totality of circumstances" indicating abuse.  In short, the UST argues that "the Debtors just want the creditors to pay for their mistakes while ignoring the necessity of adjusting their lifestyle" and "they want to keep everything even though they admit according to the schedules they cannot afford it."

In response, Debtors point out that the cause of this bankruptcy was the "calamitous loss of the job...(and) an extended period of non-employment".  Debtors argue that while "the gambling issue ... is vexing", they had basically "broke even" on their gambling so as not to have affected creditors, that the Debtors had not created debts on account of their gambling, that they had reduced their gambling (albeit continued post-petition), and that gambling is therefore not a factor in determining abuse.  Debtors' claimed that in a Chapter 13 they would be entitled to deduct expenses contractually obligated to secured creditors whether or not they had the intent or not to pay them, and therefore such expenses could not be considered in determining whether or not there is abuse.  They contend that

10

Chapter 13 would not be practical as there were not sufficient funds available for the payment of unsecured debt. Further, they argue that anticipated substantial future medical expenses due to Mrs. Smith*'s* kidney disease makes it imperative for them to receive a discharge of their other debts.[6] They do not argue with the UST's position that their post-petition transportation costs were significantly less than that indicated on their original and amended schedules.

### A. Debtors' Gambling

With regard to gambling *per se*, the Court is not making any moral or ethical judgment. Spending time and money at an Indian casino has become ingrained in American culture, particularly within Oklahoma. At the same time, however, while recreational or normal entertainment gambling might be viewed as simply equivalent to spending on a "luxury" item, gambling (and losing) at the level of the Debtors at a time when they couldn't, or wouldn't, make their mortgage payments or other obligations raises their gambling to an entirely different level. In the six months preceding bankruptcy the Debtors lost an average of $6,868.15 per month. In June and July 2017, the two months preceding the month of filing bankruptcy, Debtors lost approximately $12,000 gambling while apparently, using their own figures, having no gambling winnings whatsoever. [UST Ex. 3, pg. 58, line 5]. During this same time period Debtors were being assisted by cash gifts from family members at an average of $2,341.67 per month. [UST Ex. 3, pg. 58, line

---

[6] Mrs. Smith testified as to her health concerns, however, no evidence was produced as to the amount of possible future medical expenses or what insurance coverage may be available to defer certain costs. While the Court is empathetic to health concerns, this testimony was the first indication given by the Debtors that any health issue existed or that any expenses should be considered.

2].  In this Court's opinion, continuing to gamble during the slide into bankruptcy while leaning upon family largesse and state unemployment benefits is the sort of debtor action that crosses over a line of appropriateness.  It is not the good faith required of debtors. The Court emphasizes, however, that the gambling issue by itself is not necessarily determinative of the Debtors' "good faith" or the determination of abuse.  It is only one element to be considered in the overall totality of circumstances.

### B. Retirement Contributions

As stated above, the primary consideration in determining whether abuse exists under the totality of the circumstances test is the debtor's ability to pay.  The focus of the inquiry is thus narrowed to how the Court should calculate the Debtors' ability to pay within the context of a motion to dismiss for abuse under § 707(b)(3).  This in turn requires an examination of the expenses which the Debtors have claimed underlying their assertion that there would be no funds available to pay creditors in a Chapter 13.

One of Debtors' expenses contested by the UST is their monthly payment (payroll deduction) of $1,111.48 for retirement contributions. This is comprised of a Federal Employment Retirement System (FERS) mandatory 4.4% withholding contribution of $339.62 and the Debtor's voluntary Thrift Savings Plan (TSP) contribution of $771.86. [UST Ex.13; Doc. 45, Amended Schedules, Schedule J]. The UST argues that the voluntary contribution amount is not an allowable deduction from disposable income available for the payment of unsecured creditors.  Debtors argue otherwise, asserting that if they had filed a Chapter 13, the plan would allow them to take the voluntary retirement contributions.

Pre–BAPCPA there was a split of authority on whether voluntary retirement plan

12

contributions represented disposable income.  One line of authorities adopted a *per se* rule that voluntary retirement plan contributions were never reasonably necessary expenses in a Chapter 13 proceeding.  See *In re Anes*, 195 F.3d 177 (3rd Cir. 1999); *In re Austin*, 299 B.R. 482 (Bankr. E.D. Tenn. 2003); *In re Harshbarger,* 66 F.3d 775 (6th Cir. 1995); *In re Behlke,* 358 F.3d 429 (6th Cir. 2004).   Another line of cases allowed confirmation of Chapter 13 plans where debtors continue voluntary contributions on a "case-by-case" analysis left to the bankruptcy judge's discretion.  *In re Taylor*, 243 F.3d 124 (2nd Cir. 2001); *In re Awuku*, 248 B.R. 21, 32 (Bankr. E.D. N.Y. 2000) ("There is  absolutely no support in the legislative history to either Chapter 13 as a whole or to Section 1325... to warrant a *per se* rule....").  While there were no 10th Circuit Court of Appeals or Bankruptcy Appellate Panel decisions on the issue, bankruptcy courts within the 10th Circuit, like other Circuits were divided.  As stated in *In re Keenan*, 364 B.R. 786, 800 (Bankr. D. N.M. 2007):

> Authorities are split on whether voluntary retirement plan contributions represent disposable income. One school of thought, led by the Third Circuit, appears to adopt a  *per se* rule that voluntary retirement plan contributions are never reasonably necessary expenses in a Chapter 13 proceeding. Another school of thought, led by the Second Circuit, appears to allow the confirmation of Chapter 13 plans where debtors continue voluntary contributions to retirement plans or has adopted "case-by-case" analysis granting deference  to bankruptcy judges to determine from the facts of each individual case whether pension contributions qualify as reasonably necessary expenses. (quoting *In re King*, 308 B.R. 522, 530 (Bankr. D. Kan. 2004) (footnotes collecting cases omitted).

> The Tenth Circuit has not ruled on this issue. However, in ruling on the issue of substantial abuse in the Section 707(b) context, the Tenth Circuit adopted a "totality of the circumstances" standard. *Stewart v. United States Trustee (In re Stewart)*, 175 F.3d 796, 809 (10th Cir. 1999).  This Court

believes that the Tenth Circuit would also apply a flexible standard on a case by case basis to determine whether pension fund contributions were reasonably necessary for a debtor's support.

Factors that other court's have considered using this approach include: 1) the age of the debtor and the amount of time until expected retirement, 2) the amount of the monthly contributions and the total amount of pension contributions, 3) the likelihood that buying back the pension after the bankruptcy would jeopardize the debtor's fresh start, 4) the number and nature of debtor's dependents, 5) evidence that the debtor would suffer adverse employment conditions if the contributions are ceased, 6) the debtor's yearly income, 7) the debtor's overall budget, 8) who is challenging the pension payments, or 9) any other constraints on the debtor that make it likely that the pension contributions are reasonably necessary expenses for the debtor. (citing *King,* 308 B.R. at 531 n.18).

Did BAPCPA alter the appropriateness of considering voluntary retirement contributions on a § 707(b)(3) motion on a case by case basis?  It did not.  It is true that BAPCPA substantially impacted the manner in which retirement contributions are now treated in Chapter 13 cases.  Under BAPCPA, § 1322(f) specifically excludes from § 1325(b)'s definition of "disposable income" amounts required to repay retirement account loans.[7]

It appears that the argument of the Debtors in the present case, though not articulated as such, is that because retirement contributions or repayments of retirement loans would be excluded from being available in a Chapter 13 plan they should not be considered in a hypothetical Chapter 13 analysis under § 707(b)(3).  The Debtors'

---

[7] Section 1322(f), added by BAPCPA, states: "A plan may not materially alter the terms of a loan described in Section 362(b)(19) and any amounts required to repay such loan shall not constitute 'disposable income' under Section 1325." Section 362(b)(19) covers loans from 401k plan accounts, a thrift savings account or other types of retirement accounts.

reasoning is flawed. First, ability to pay under a hypothetical Chapter 13 plan is but one factor in evaluating the totality of the circumstances in connection with a determination of abuse. Second, just because the Debtors may not be able to confirm a hypothetical Chapter 13 plan does not mean that they are entitled to relief under Chapter 7. As the court stated in *In re Krohn*, 886 F.2d 123, 127 (6th Cir. 1989):

> [t]here is no constitutional right to a bankruptcy discharge, and the "fresh start" provided for by the Code is a creature of congressional policy. *United States v. Kras,* 409 U.S. 434, 446-47, 93 S.Ct. 631, 638-39 (1973). Congress, within the limits set by the constitution, is free to deny access to bankruptcy as it sees fit. *Id.* at 447, 93 S.Ct. at 639. Here, its failure to specifically provide for linkage between Chapters 7 and 13 is evidence that Congress believed there is some circumstances where it would not be equitable to grant a particular debtor a fresh start.

Third, although Congress excluded retirement contributions from the determination of disposable income in Chapter 13 cases under BAPCPA, the independent requirement under § 1325(a)(3) that the Court determine that a Chapter 13 plan be proposed in good faith remains fully intact. *In re Shelton*, 370 B.R. 861, 867 (Bankr. N.D. Ga. 2007). [8]

Accordingly, the great majority of cases hold that BAPCPA did not alter the court*'s* obligation to consider retirement contributions as "disposable income" when determining ability to pay under § 707(b)(3). As stated in *In re Tucker*, 389 B.R. 535, 539-40 (Bankr. N.D. Ohio 2008):

> Notwithstanding these legislative changes (by BAPCPA) to

---

[8] The numbers in *Shelton* bear striking similarity to the ones in the present case. There, the debtor proposed a 0% plan to unsecured creditors while contributing $655 a month to a retirement plan. Over the life of the plan he would have contributed $39,300 to his retirement account, while his unsecured creditors whose debts totaled $89,237 would receive nothing. These facts led the Court to conclude the plan was not proposed in good faith.

> treatment of certain retirement contributions and loan repayments as disposable income in Chapter 13 plans, courts have continued, quite appropriately, evaluating them as part of the totality of circumstances under § 707(b)(3)(B).

See e.g., *In re Zaporski,* 366 B.R. 758 (Bankr. E.D. Mich. 2007); *In re Beckerman,* 381 B.R. 841 (Bankr. E.D. Mich. 2008). Similarly, in *In re Hilmes*, 438 B.R. 897, 906-07 (N.D. Tex. 2010):

> Hilmes argues that in filling out official form 22A for purposes of the "means test" of section 707(b)(2), she did not claim her 401k contribution as an expense. Thus, the contributions had no impact on the calculation of her disposable income. But, as is clear by the section's language and structure, the means test of section 707(b)(2) and dismissal for abuse under section 707(b)(3) are separate analyses. See *Ross-Tousey-Neary (In re Ross-Tousey)*, 549 F.3d 1148, 1161-62 (7th Cir. 2008) (stating that despite a ruling that allowed the debtor to take a deduction that reduced the debtor's income below the presumptively-abusive level under the means test, the trustee could still seek dismissal for abuse under section 707(b)(3)).
>
> ****
>
> Thus, however Hilmes' 401k contributions are treated under the means test, they are a proper consideration under section 707(b)(3)(B)'s abuse analysis.

See also *In re Daugherty*, 416 B.R. 582, 586 (Bankr. N.D. Tex. 2009) (describing § 707(b)(3) as "an alternative basis for judging abuse" from the means test); *In re Pandl*, 407 B.R. 299, 302 (Bankr. S.D. Ohio 2009) (considering retirement contributions as "disposable income"); *In re Felske,* 385 B.R. 649 (Bankr. N.D. Ohio 2008).

Here the Debtors seek the exclusion of $771.86 of voluntary contributions to their retirement plans. In *Woody v. United States (In re Woody)*, 494 F.3d 939, 952 (10th Cir. 2007) the Court of Appeals for the Tenth Circuit discussed the necessity of voluntary retirement contributions in the context of student loan discharge:

16

To be sure, we agree with the principle that savings for one's retirement is a laudable goal that should generally be encouraged. However, we also agree with the many other courts that have held that, in the context of bankruptcy proceedings, retirement contributions should not take precedence over repayment of preexisting debts. "Voluntary contributions to retirement plans ... are not reasonably necessary for a debtor's maintenance or support and must be made from disposable income.... [A]lthough investments may be financially prudent, they certainly are not necessary expenses for the support of the debtors or their dependents. Investments of this nature are therefore made with disposable income; disposable income is not what is left after they are made." *In re Anes*, 195 F.3d 177, 180-81 (3rd Cir.1999); *accord In re Harshbarger*, 66 F.3d 775, 778 (6th Cir. 1995) ("[I]t would be unfair to the creditors to allow the Debtors in the present case to commit part of their earnings to the payment of their own retirement fund while at the same time paying their creditors less than a 100% dividend.").

This Court will therefore consider the Debtors' retirement contributions as a factor for possible abuse under § 707(b)(3) by evaluating whether such contributions appear to be reasonably necessary for the support of the debtor or the debtors' dependents. Factors relevant to this determination include: (1) the debtor's age and time left until retirement; (2) the amount of the debtor's existing retirement savings (3) the level of yearly income; (4) overall budget; (5) amount of monthly contributions; (6) the number and nature of the debtor's dependents; (7) evidence that the debtor would suffer adverse employment conditions if the contributions are ceased; (8) who is challenging the pension payments and (9) any other constraints on the debtor that make it likely that pension contributions are reasonably necessary expenses for this particular debtor. *In re Keenan,* 364 B.R. 786, 801 (Bankr. D. N.M. 2007); *In re King*, 308 B.R. 522, 531 (Bankr. D. Kan. 2004); *In re Beckerman* , 381 B.R. 841, 848 (Bankr. E.D. Mich. 2008).

Considering such factors, in the context of the totality of the Debtors' individual circumstances, the Court finds that the allowance of the mandatory contribution of $339.62 is sufficient, and that the voluntary contribution of $771.86 is not a reasonably necessary expense in a § 707(b)(3) analysis. Therefore the Debtors' monthly expense for retirement contributions should be reduced by $771.86.

### C. Transportation Expenses

In their original Schedules filed in August 2017 the Debtors listed "transportation expense" of $1,100. The Debtor explained that this figure was attributable to the fact that he was working in Texas and incurred substantial fuel and other vehicle cost. While that figure appears to be high, the UST did not to challenge that expense while the Debtor was employed out-of-state. When the Debtors filed their Amended Schedules in May 2018 they continued to include the $1,100 transportation expense notwithstanding the fact that Mr. Smith was now employed at Tinker Air Force Base. The UST, therefore, argued that rather than the $1,100 travel expense the Debtors should be allowed the IRS standard vehicle operating expense for two financed vehicles at $430 per month. The Debtor acknowledged that the transportation expense should be reduced. However, the Debtor did not provide any additional credible evidence as to the current monthly expense for transportation. The Court will therefore place the allowable transportation cost at $430 per month.

### D. Travel Trailer Expense

The UST argues that the Debtor's monthly payment of $493 for the 2017 Keystone travel trailer is not a necessary expense given the fact that the Debtor is no longer

18

employed out-of-state. Debtor argues that retention of the trailer would be necessary in the event that the residence is foreclosed. The Court regards ownership of the travel trailer, under the present circumstances, to be equivalent to a luxury item and not a necessary expense. The purchase of the $50,000 travel trailer in the same month (April 2017) that the Debtors made their last house mortgage payment and fourteen months before bankruptcy is now an extravagance. Debtors' counsel has stated that he fears the Court's disallowance of such an expense is equivalent to compelling a debtor to surrender his property in order to be entitled to Chapter 7 relief. That is not true. The Court cannot compel any debtor to surrender or sell his/her property. What the court is required to do is determine, based upon the totality of circumstances, when expenses are reasonably necessary. In this case, the Debtors' travel trailer expense is excessive. The Debtors can certainly keep and pay for the travel trailer, but they may be required to reduce other living expenses in order to do so without depriving them or their adult children of adequate food, clothing, shelter or other necessities.

The UST also believes the $193 per month car payment for one of the Debtors' adult sons who is apparently attending college and working is not a necessary expense. There is ample authority that supporting adult children at the expense of unsecured creditors is not permissible. See e.g. *In re Hess*, 2007 WL 3028422 (Bankr. N.D. Ohio 2007) (debtor's contribution of $300 per month to support her 24-year-old son while attending optometry school was not proper deduction from income); *In re Pfahler*, 2007 WL 2156401 (Bankr. N.D. Ohio 2007) (finding abuse where debtor had stable employment and income and was spending $350 per month for the support of his college-age son) (citing *U.S. Trustee v. Harrelson*, 323 B.R. 176, 179 (Bankr. W.D. Va. 2005)); *In re Hicks*, 370

B.R. 919, 923 n.7 (Bankr. E.D. Mo. 2007) (holding that the debtor was not entitled to deduct under section 707(b)(2) expenses of college-age son because "for an adult to be able to attend college as a full-time student is a luxury, not a necessity, and the costs associated with such attendance do not constitute expenses incurred for the provision of a person's necessary care and support"); *In re Navin*, 548 B.R. 343, 352 (Bankr. N.D. Ga. 2016) ("It is fairly well established in these circumstances that debtors are not entitled to provide support to their adult children in lieu of providing funds to their creditors.").  The Court deems the payment of the son's car payment unnecessary and will add the $193 to disposable income.

### E. Ability to Pay

An appropriate method of evaluating whether a debtor has the ability to repay his or her debts is to determine what amount of that indebtedness could be repaid in a hypothetical Chapter 13 plan.  *In re Lipford,* 397 B.R. 320, 327-28 (Bankr. M.D. N.C. 2008); *In re Mestemaker*, 359 B.R. 849, 856 (Bankr. N.D. Ohio 2007).  The UST analysis and testimony was that with a calculation of the proper disposable income there would be available to unsecured creditors a payment of $858 per month, $51,484 over 60 months, or 62.21%.  The Court finds that analysis persuasive.  This far exceeds the "presumption of abuse" level in § 707(b)(2)(A)(I), currently at $12,850 over five years, or about $215 a month over 60 months.  Courts have found that "a debtor's ability to repay 25% or more of his/her unsecured nonpriority debts in a Chapter 13 plan is *persuasive evidence*" of abuse.  *In re Mondragon*, 2007 WL 2461616 (Bankr. D. N.M. 2007).

### VII. Conclusion

The Debtors' total financial situation as a measure of ability to pay, and bad faith are separate and sufficient grounds for dismissal. Either ability to pay *or* bad conduct in connection with the bankruptcy will warrant dismissal for abuse under § 707(b)(3). In the present case, the Court finds that there is both bad faith and, based on the readjustment of expenses for transportation, retirement, travel trailer expense, and third car payment, there is an ability to pay something to the unsecured creditors. The Court therefore concludes that allowing these Debtors to continue in a Chapter 7 proceeding would be an abuse of the bankruptcy system.

Accordingly, pursuant to 11 U.S.C. § 707(b)(1) and (3) the Motion to Dismiss filed by the United States Trustee [Doc.24] is **sustained**. Provided, however that the Debtors shall be granted ten days from the entry of this Order to convert their case to Chapter 13. If the Debtors do not consent to conversion to Chapter 13 the case will be **DISMISSED**.

**# # #**